J-S26015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ERIC ROMONT HOGAN | |
| Appellant | No. 1328 MDA 2020 |

Appeal from the Judgment of Sentence December 14, 2011
In the Court of Common Pleas of Luzerne County
Criminal Division at No: CP-40-CR-0003847-2010

BEFORE:  STABILE, J., MURRAY, J. AND MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED:  DECEMBER 7, 2021**

Appellant, Eric Romont Hogan, appeals from his judgment of sentence of eleven to twenty-two years' imprisonment for burglary and aggravated assault.  We treat this appeal as a timely direct appeal for the reasons given in the procedural history below, and affirm Appellant's judgment of sentence.

The trial court summarized the factual history of this case as follows:

> On the evening of November 1, 2010, at approximately 10:00 PM, Robert Deluca of Plymouth Pennsylvania heard someone pounding at his door.  He answered the pounding by opening the door but no one was there.  Instead, he saw a black male wearing a dark hoodie banging on the door of his neighbor, Donald Skiff.  Skiff answered his door and he was met by the appellant who told him that he was being chased by a group of men and needed a phone to call 911.  Skiff did not see anyone chasing the appellant and he did not see anything unusual on the street.  Nonetheless, he allowed the appellant to come inside his residence and then he called 911 from his cell phone and handed the phone to the appellant.

The appellant told the 911 operator his name was Eric Hogan. The appellant continued, telling the 911 operator that four black males in a red Jeep were chasing him and shooting at him. He said that a bullet from a nine millimeter handgun grazed his leg. When the phone call ended, Skiff asked the appellant to leave his house. The appellant, at least initially complied and exited Skiff's residence. As Skiff attempted to lock the door, the appellant re-entered the residence. The next thing Skiff could then recall was laying on his kitchen floor being ferociously assaulted. Skiff [regained] consciousness one week later in a hospital.

Officer Michael Derwin of the Plymouth Borough Police Department testified that he was the first officer to arrive on the scene. He spoke with Deluca and then proceeded to check the area for a red Jeep and four black males. He then responded to Skiff's residence. Upon arriving there he heard a door slam. He then went to the rear of Skiff's residence where he heard Skiff's cries for help. Skiff told Officer Derwin that he was assaulted by a bald black male wearing a blue hoodie. Officer Charles Benson of the Edwardsville Police Department encountered the appellant nearby and, suspecting at first that he was a victim of crime, secured him in his patrol car unhandcuffed.

The appellant was then returned to the scene of the assault where he spoke with Officer Derwin. Officer Derwin observed what appeared to be blood on the appellant's clothing. DNA analysis of the appellant's sweatshirt would later reveal that it was stained with Skiff's blood. Officer Derwin, like Officer Benson, also noted that the appellant's left hand appeared to be bloodied and swollen. Officer Derwin did not observe any injury to the appellant's legs. The police did not find any red vehicles or observe any other males fleeing in the area.

An expert witness, Dr. Frederick Toy, also testified at trial. Dr. Toy was on duty at the trauma unit when Skiff arrived for treatment. He testified that Skiff went into cardiac arrest twice as a result of his injuries. He also testified that his injuries were consistent with being choked and punched in the face repeatedly. Dr. Toy agreed that the persistent health and memory losses of Skiff were consistent with the injuries he suffered consequent to the assault upon him.

In addition to the statements that he made to the 911 operator, the appellant made multiple statements to police. When he was

first encountered by law enforcement, he advised Officer Benson that three or four black males were chasing him and shooting at him. Later, when speaking with a Luzerne County Detective, he claimed that four white males were chasing him. He said that one of the white males followed him into Skiff's home where the pair fought while Skiff called 911. He denied that his hand was injured in the altercation. Instead, he claimed that he injured his hand in a fall. [Of note], his statement to the County Detective did not include any reference to the four black males or the red Jeep.

Trial Court Opinion, 3/12/21, at 1-4 (citations omitted).

On October 14, 2011, the jury found Appellant guilty of aggravated assault (graded as a first-degree felony), burglary and related offenses. On December 14, 2011, the court sentenced Appellant to 48-96 months' imprisonment for burglary and to a consecutive sentence of 84-168 months' imprisonment for aggravated assault. The remaining offenses merged for sentencing purposes. Appellant filed timely post-sentence motions seeking modification of sentence and a new trial, which the court denied on January 31, 2012.

Appellant filed a timely direct appeal, and this Court affirmed his judgment of sentence on February 4, 2013. Appellant did not appeal to our Supreme Court.

On September 10, 2014, Appellant filed a Post-Conviction Relief Act ("PCRA") petition. On February 20, 2015, the PCRA court denied his petition. Appellant appealed to this Court, and on October 4, 2016, we issued a memorandum vacating the order of dismissal and remanding for a hearing to determine whether appellate counsel on direct appeal was *per se* ineffective

for failing to file a requested petition for allowance of appeal to the Supreme Court.

On remand, the PCRA court issued an order on April 5, 2017 granting Appellant leave to file a petition for allowance of appeal to the Supreme Court. The PCRA court did not address the other claims in Appellant's PCRA Petition. Appellant filed a petition for allowance of appeal, which the Supreme Court denied on September 11, 2017.

On March 25, 2019, Appellant filed a petition seeking a hearing to address the unresolved PCRA claims that were raised in Appellant's PCRA Petition but not addressed due to reinstatement of his right to seek allowance of appeal. The PCRA court denied Appellant's petition as untimely.

On August 5, 2019, Appellant filed another PCRA petition. On January 17, 2020, Appellant filed a praecipe to withdraw this Petition. Appellant then filed a habeas corpus petition in federal court. On September 25, 2020, a federal magistrate held that direct appeal counsel rendered ineffective assistance "at all stages of direct appeal" and granted Appellant leave to file another direct appeal within the next 120 days. Order, **Hogan v. McGinley**, No. 18-417 (M.D. Pa., Sep. 25, 2020). On October 21, 2020, Appellant filed a notice of direct appeal in the court of common pleas. Accordingly, we treat this appeal as a timely direct appeal.

Appellant raises the following issues in this appeal:

I. Did the lower court err in admitting the victim's out-of-court, testimonial, statements to police identifying Appellant, when the victim could not recall making the statements?

II. Did the lower court err in preventing Appellant from presenting medical records containing the victim's statements exculpating Appellant?

III. Was the jury's verdict against the weight of evidence?

IV. Is Appellant's sentence contrary to the Sentencing Code and fundamental norms of the sentencing process, violative of the legislative preference that the sentences for burglary and the target offense generally merge, beyond the statutory maximum he could have received for either count alone, and a virtual life sentence, and, as such, unreasonable?

V. Is Appellant's sentence grossly disproportionate as compared to similar cases, and so cruel and unusual?

Appellant's Brief at 2.

In his first argument, Appellant contends that the trial court erred by admitting Skiff's statement to Officer Derwin that he was assaulted by a bald black male wearing a blue hoodie. According to Appellant, Skiff's statement was hearsay. We conclude that Skiff's statement was admissible under the excited utterance exception to the hearsay rule.

The admission of evidence is solely within the discretion of the trial court, and its evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Manivannan*, 186 A.3d 472, 479 (Pa. Super. 2018).

Officer Derwin was the first officer to speak to Skiff at the scene of the assault. On direct examination, Officer Derwin testified that he heard the rear

door of Skiff's house slam as he was knocking on the front door. N.T., 10/13/11, at 176-77. Officer Derwin walked around to the rear of the house to investigate the sound, and there, he heard a male inside yelling "help me." *Id.* at 177. He proceeded to the back porch, where he found the screen door closed. *Id.* Peering inside, he observed Skiff "laying on the floor with severe head injuries." *Id.*

Officer Derwin called for an ambulance, entered the house and spoke with Skiff. The prosecutor asked what Officer Derwin said to Skiff, and Officer Derwin answered, "I asked him what had happened. He said he got beat up. I asked him if he knew who did it." *Id.* at 178. Defense counsel objected, and the prosecutor stated that Skiff's statement was admissible as an excited utterance. *Id.* The court sustained defense counsel's objection because no foundation had been laid for its admission as an excited utterance. *Id.*

Later in Officer Derwin's testimony, counsel discussed Officer Derwin's testimony about Skiff's statement at sidebar. Defense counsel argued that Skiff did not make an excited utterance because "it's not excited, he's not blurting something out, it's under interrogation." *Id.* at 194. The court responded that the prosecutor "can pursue the line of questioning and we'll address it as it comes up." *Id.*

Skiff was "laying there, you could plainly see that he was in pain. He was grabbing for his eyes. He was telling me I can't see." *Id.* at 195. "At that point," Officer Derwin continued, "we told him to just wait for the

- 6 -

ambulance to get there. The reason he wasn't able to see me was because his eyes were swollen shut. At that time he was conscious and was able to give me a description of the male that did it." *Id.* The prosecutor asked whether Skiff was anxious, Officer Derwin answered, "I wouldn't really say anxious, but I think he was more concerned that he couldn't see. He didn't know—like he couldn't see—he didn't know who I was." *Id.* The prosecutor asked whether Skiff stated who did this to him. *Id.* at 195-96. Defense counsel objected, but the court overruled the objection. Officer Derwin answered, "He told me it was a black male, bald head, with a blue hoodie." *Id.* at 196.

Although Skiff survived the attack and testified at trial, the savagery of the attack left him unable to recall multiple events, including his conversation with Officer Derwin. *Id.* at 90 (Skiff's testimony that "aside from that waking up [in the hospital] and seeing him hitting me from the time I was walking toward the door, I don't remember anything else that happened in my house. I don't remember the police coming. I don't remember anything").

The trial court properly admitted Officer Derwin's testimony because Skiff's statement to the officer was an excited utterance. The Rules of Evidence define an excited utterance as "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Pa.R.E. 803(2). Our Supreme Court has stated:

> While the excited utterance exception has been codified as part of
> our rules of evidence since 1998, see Pa.R.E. 803(2), the common

law definition of an excited utterance remains applicable, and has been often cited by this Court:

> [A] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person has just participated in or closely witnessed, and made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its having emanated in whole or in part from his reflective faculties.... Thus, it must be shown first, that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and, second, that her declarations were a spontaneous reaction to that startling event.

*Commonwealth v. Murray*, 83 A.3d 137, 157-58 (Pa. 2013) (citations omitted). "In determining whether a remark fits within this exception, a court must conduct a fact-specific inquiry and ascertain whether the remark was sufficiently contemporaneous to the startling event to be considered spontaneous." *Commonwealth v. Sherwood*, 982 A.2d 483, 496 (Pa. 2009). Multiple factors are relevant to this fact-specific inquiry, including but not limited to, the nature of the event, the amount of time between the event and the utterance, *id.*, and the victim's levels of stress and pain. *Commonwealth v. Watson*, 627 A.2d 785, 787-89 (Pa. Super. 1993) (statement by three-year-old child who had sustained burns by having his hand immersed in bowl of hot soup, that "my daddy did it," was admissible as excited utterance, where burn of that sort was intensely painful and emotionally traumatic, and child was distressed when he spoke to police).

The fact that the statement is made in response to a question does not preclude its admission as an excited utterance. *See*, *e.g.*, *Commonwealth v. Jones*, 912 A.2d 268, 282 (Pa. 2006) (shooting victim's statement identifying defendant as one of the shooters, made less than ten minutes after being shot, while victim was bleeding from his gunshot wound and awaiting transport to the hospital, as well as second statement to police, made approximately thirty minutes later in response to officer's question about who shot him, were admissible as excited utterances, even if statements were made in response to questioning); *Commonwealth v. Penn*, 439 A.2d 1154, 1159 (Pa. 1982) (witness's testimony that victim's son had told him within half-hour of murder that defendant had killed victim was admissible as an excited utterance where son was visibly upset and shaken from witnessing mother's stabbing when he made statement in response to question by police officer); *Commonwealth v. Manley*, 985 A.2d 256, 266 (Pa. Super. 2009) (attempted murder victim's statements in police report were admissible as excited utterances; victim was shot between 8:45 and 8:50 p.m., police officer dispatched to scene at 8:53 p.m. officer questioned victim upon arriving at scene, and victim described assailants while bleeding from his gunshot wounds and awaiting transport to hospital); *Commonwealth v. Bibbs*, 970 A.2d 440, 454 (Pa. Super. 2009) (where victim was bleeding and appeared to have suffered gunshot, and officer arrived on scene swiftly, nervous excitement of

situation had not abated, and victim's answer to one simple question of officer about who shot him admissible as excited utterance).

Appellant claims that Skiff's statement was not a spontaneous reaction to a startling event, because "it was made after he was made aware that he was now safe, was in response to a question posed by a police officer, and was a (short) narrative description." Appellant's Brief at 15. Appellant also insists that Skiff was not "under the stress of excitement" caused by the assault in light of Officer Derwin's testimony, "I wouldn't say [Skiff] was anxious." We disagree.

Viewed in their totality, the circumstances make clear that Skiff's statement was not a product of his reflective faculties. When Officer Derwin first saw Skiff, he was lying on the ground calling for help. He had just been beaten so brutally that his eyes were swollen shut. While describing the assailant to Officer Derwin, he was grabbing for his eyes and complaining that he could not see. It was obvious that he was in considerable pain; indeed, he subsequently lost consciousness and nearly died in the hospital.[1] His conduct

---

[1] In **Commonwealth v. Blackwell**, 494 A.2d 426, 430 (Pa. Super. 1985), we observed that a victim's level of pain may render a victim's statement following an accident as an excited utterance due to the victim's level of pain. "If the decedent was so much in pain that his attention was focused on his pain and not on the circumstances surrounding the accident, this statement as to those circumstances cannot be said to be shrewd and self-calculating." *Id.* at 432-33 (citing **Thompson v. City of Philadelphia**, 294 A.2d 826, 828 (Pa. Super. 1972)) (internal citations omitted).

during the encounter with Officer Derwin was the type of conduct exhibited by a person under pain and stress from a startling event, *see Watson*, *Jones,* not, as Appellant argues, by a person who felt "safe."

Appellant's claim that Skiff was using his reflective faculties becomes even more doubtful when we consider that Officer Derwin heard someone (likely the assailant) leaving Skiff's house moments before spotting Skiff on the ground. This indicates that the beating had just ended, and that the interval between the attack and Skiff's statement was even shorter than the intervals between the startling incidents and the declarants' statements found admissible in *Jones*, *Penn* and *Manley*. It is implausible under these rapidly unfolding circumstances that there was time for Skiff to reflect on the events or fabricate his statement to Officer Derwin about the assailant's appearance.

Our view of this issue does not change merely because Skiff made his statement in response to a question by Officer Derwin. *Jones*, *Penn*, and *Manley* demonstrate that a statement may constitute an excited utterance even when it occurs in response to a police officer's question. Officer Derwin's brief, open-ended question did not in any way make Skiff's statement any less spontaneous or any more reflective. Furthermore, Skiff's response was not a narration of the events; it was a one-sentence answer describing several features of the assailant.

Nor does our conclusion change because of Officer Derwin's testimony that "[he] wouldn't say [Skiff] was anxious." Appellant infers from this

testimony that Skiff was calm and unruffled and thus incapable of making an excited utterance. However, as we said in **Commonwealth v. Sanford**, 580 A.2d 784 (Pa. Super. 1990), "there is no requirement that the declarant be emotionally overpowered, but rather must be speaking under the stress of excitement." **Id.** at 789 (evidence demonstrated that child was speaking under stress of excitement when she announced to her mother that she had been assaulted by defendant, though child engaged in what could be considered ordinary casual conversation with her mother upon returning home from defendant's house, where child followed mother from room to room and even entered bathroom while her mother was using it, child offered her statement of what had occurred without solicitation, and mother testified that when declaration was made child had different look on her face as if "she didn't know whether it was right or wrong"). The evidence discussed above establishes that Skiff was in pain and shock, and that he was speaking under the stress caused by Appellant's violent attack.

For these reasons, the trial court acted within its discretion by admitting Skiff's statement to Officer Derwin as an excited utterance.

Appellant also contends that Officer Derwin's testimony violated his right to confront witnesses guaranteed under the Sixth Amendment, because (1) Skiff was unable to recall his statement to Officer Derwin due to amnesia and therefore was "unavailable" under the Sixth Amendment to testify about this subject, and (2) Skiff's statement was "testimonial" in nature because it was

made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Appellant waived this argument because defense counsel only raised a hearsay objection to Skiff's statement. Hearsay is a matter of Pennsylvania evidentiary law, while the Confrontation Clause is a matter of constitutional law and therefore is a separate issue. It is untenable to suggest, as Appellant does in his appellate brief, that raising a hearsay objection necessarily raises a Confrontation Clause claim by implication. *See Commonwealth v. Cash*, 137 A.3d 1262, 1275 (Pa. 2016) (where defendant raises an objection before trial court on specific grounds, only those grounds are preserved for appeal).

In his next argument, Appellant claims that the trial court erred when it did not admit Defense Exhibit 6, a note written by Dr. Fitch in the hospital emergency room that Skiff was the source of the patient-history information supplied to EMS, he "[a]ppear[ed] reliable," and he came to the emergency room "via EMS after being allegedly assaulted by assailants." N.T., 10/13/11, at 135-138. Appellant contends that this exhibit was relevant to show that Appellant was attacked by multiple individuals, thus refuting the Commonwealth's position that Appellant was assaulted by only one man, Appellant.

Appellant's argument fails because Defense Exhibit 6 was cumulative of other statements by Skiff that were admitted into evidence in which Skiff told medical professionals that he was attacked by four men who pistol-whipped

him. Defense counsel had Dr. Toy read a statement from Defense Exhibit 1 indicating that a "63-year-old white male whose house was broken into and was assaulted by four men who pistol whipped his face, head, and neck area." N.T., 10/13/11, at 114. Defense Exhibit 2 appears to be the exact same report as Defense Exhibit 1. *Id.* at 116. Dr. Toy confirmed that Defense Exhibit 2 contained the same statement as outlined above. *Id.* at 118. Dr. Toy then noted that on November 2, 2020, Skiff could not speak, so he could not give a history. *Id.* at 126. Dr. Toy further noted that the history recited aloud did not come from Skiff but from other individuals, and in any event, Skiff was taken to surgery shortly after arriving at the hospital. *Id.* at 127. Defense counsel then had Dr. Toy say that the history noted in Defense Exhibit 3 was the same as in Defense Exhibit 1 and 2. *Id.* at 129. Defense counsel also pointed out that the same history was repeated in Defense Exhibit 5. *Id.* at 133. Although the trial court did not permit defense counsel to question Dr. Toy about Defense Exhibit 6, *id.* at 135-38, the court admitted Defense Exhibits 1, 3, 4, and 5 into evidence. N.T. at 142-143.

Pennsylvania law permits the court to exclude cumulative evidence. Pa.R.E. 403. Cumulative evidence is additional evidence of the same character as existing evidence that supports a fact that is already established. *Commonwealth v. G.D.M.*, 926 A.2d 984, 989 (Pa. Super 2007). Defense counsel already established through four documents, Defense Exhibits 1, 3, 4, and 5, that Skiff apparently had said he was assaulted by four men. The

jury did not need to be told again what Skiff said about the number of men who attacked him. Defense Exhibit 6 was cumulative of the fact established by Defense Counsel, that multiple people attacked Mr. Skiff. Therefore, the trial court did not err in excluding Defense Exhibit 6.

Appellant next argues that the trial court erred in denying his post-sentence motion for a new trial. He contends that the verdict was against the weight of the evidence and does not withstand scrutiny because (1) the evidence indicated that multiple individuals attacked Appellant, (2) Skiff himself could not remember the attack, (3) the police hurriedly, but mistakenly, concluded that Appellant was the sole perpetrator because he happened to be near Skiff's residence at the time of his arrest, and (4) Skiff's statement to medical personnel that four men attacked him belied the Commonwealth's attempt to pin the attack on Appellant. We conclude that no relief is due.

In reviewing a challenge to the weight of the evidence, our Supreme Court has instructed as follows:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Commonwealth v. Clay***, 64 A.3d 1049, 1054-55 (Pa. 2013). This Court does not step into the shoes of the trial court to revisit the question of whether

the verdict was against the evidence. Rather, our task is to "analyze whether the trial court abused its discretion by reaching a manifestly unreasonable judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." *Id.* at 1056. A new trial should only be awarded "when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* at 1055.

The trial court gave the following reasons for denying Appellant a new trial:

> There is no dispute that the appellant entered Skiff's residence. The appellant had injuries to his bloodied hand and his shirt was covered with the victim's blood. Robert Deluca, a neighbor who saw the appellant at Skiff's door, was up and alert and he did not see any red Jeep or group of men. He testified that after he heard the knock at his door, "I opened the door—because I looked out the door window—so then I just opened the door and I was standing in the screen door. And I didn't see anybody and I was looking around, and I never left the door. And then I went out on the porch and the police came probably around five minutes later, right around five minutes, they were shining the lights down the street." The police officers who quickly responded did not see anyone else either. The only one who was seen in the area was the Appellant.
>
> The appellant did not testify, as is his right, but the statements that he did make to Skiff, to the 911 operator, the police and a detective were inconsistent or clearly false. The appellant was not shot or even "grazed" by a nine-millimeter bullet. Appellant first reported to 911 that four black males were chasing him. Soon after, he told detective Fabian that four white males were chasing him. He told detective Fabian that he was fighting with a white male inside Skiff's residence while Skiff called 911. The recording of the 911 call belies this claim. The Appellant's statement to detective Fabian did not include any mention of a firearm. There were no reports of shots fired in the area that night.

- 16 -

Although this case seems like an example of a senseless crime, there is no requirement that the jury uncover or intuit a motive or purpose for any of these crimes. The jury need only find that the accused is guilty of the crimes beyond a reasonable doubt. Plainly, there was adequate evidence to demonstrate the Appellant's guilt and the weight of evidence presented firmly pointed to his guilt. Accordingly, this allegation of error fails.

Trial Court Opinion, 3/12/21, at 19-21. We see no abuse of discretion in this analysis. Although Appellant attempts to point out discrepancies in the Commonwealth's version of events, it was well within the jury's province to accept the Commonwealth's account instead of Appellant's. This is not a case where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Clay*, 64 A.3d at 1054-55.

In his next argument, Appellant insists that the trial court acted unreasonably by imposing consecutive sentences for burglary and aggravated assault. The trial court crafted sentences in the standard guidelines range for both burglary and aggravated assault but made these sentences consecutive. We conclude that Appellant fails to raise a substantial question that his sentence is inappropriate. Regardless, the trial court gave satisfactory reasons for its sentence.

This issue implicates the discretionary aspects of Appellant's sentence. *Commonwealth v. Moury*, 992 A.2d 162, 169 (Pa. Super. 2010) (challenging the imposition of consecutive sentences implicates the discretionary aspects of the sentence). Because "there is no absolute right to

appeal when challenging the discretionary aspect of a sentence," **Commonwealth v. Dodge**, 77 A.3d 1263, 1268 (Pa. Super. 2013), an appellant challenging the discretionary aspects of a sentence must invoke this Court's jurisdiction by satisfying a four-part test. We must determine: (1) whether the appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether the appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code. **Moury**, 992 A.2d at 169-70.

For purposes of our review, we accept that Appellant has met the first three requirements of the above test. Therefore, we must determine whether Appellant has raised a substantial question. Whether a particular issue constitutes a substantial question regarding the appropriateness of a sentence is a question to be evaluated on a case-by-case basis. **See**, **e.g.**, **Commonwealth v. Kenner**, 784 A.2d 808, 811 (Pa. Super. 2001). As noted in **Commonwealth v. Mastromarino**, 2 A.3d 581 (Pa. Super. 2010),

> [a] substantial question will be found where an appellant advances a colorable argument that the sentence imposed is either inconsistent with a specific provision of the Sentencing Code or is contrary to the fundamental norms which underlie the sentencing process. At a minimum, the [Pa. R.A.P.] 2119(f) statement must articulate what particular provision of the code is violated, what fundamental norms the sentence violates, and the manner in which it violates that norm.

**Id.** at 585-86; **see also** 42 Pa.C.S.A. § 9781(b).

Appellant argues that the imposition of consecutive sentences violates a series of statutes and Sentencing Guidelines. He first contends that when two or more mandatory-minimum sentences apply, the instruction is not that the court should apply both mandatory minimums consecutively; instead the Code instructs the court to apply the greater mandatory minimum, not both. 42 Pa. C.S. § 9716. Section 9716 is inapposite because burglary and aggravated assault do not require mandatory minimum sentences. Appellant cites various provisions relating to the appropriate sentence when crimes merge, but there is no law requiring merger of burglary and aggravated assault for sentencing purposes. Appellant suggests that 18 Pa.C.S.A. § 3502(d) does not allow separate sentences for burglary and aggravated assault. Section 3502(d) provides, "A person may not be sentenced both for burglary and for the offense which it was his intent to commit after the burglarious entry or for an attempt to commit that offense, unless the additional offense constitutes a felony of the first or second degree." This provision does not apply here, since Appellant's conviction for aggravated assault is graded as a first-degree felony.

Appellant maintains that consecutive sentences are improper because the legislature already took the gravity of his offense into account in the elevated offense gravity scores for aggravated assault resulting in serious bodily injury (11) and for burglary of a home with a person present (9). Appellant also asserts that the court could have imposed nonconsecutive

sentences in the aggravated range for both offenses instead of consecutive sentences in the standard range. Finally, he argues that he raises a substantial question because (1) his maximum sentence of 22 years is greater than the maximum he could have received for either count alone, and (2) it amounts to a virtual life sentence because it will keep him in prison past age seventy.

These arguments all fail for the same reason. It is well established that "the imposition of consecutive, rather than concurrent, sentences may raise a substantial question in only the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment." *Moury*, 992 A.2d at 171-72. This case does not involve an "extreme circumstance" in which consecutive sentences are improper. The crimes in this case—a burglary of an occupied residence and a violent attack that nearly killed the victim—were extremely serious. The trial court imposed consecutive sentences that matched the collective gravity of these offenses.

Even were we to assume Appellant presented a substantial question, we would still conclude his sentence was a reasonable exercise of the trial court's discretion. "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Barnes*, 167 A.3d 110, 122 n.9 (Pa. Super. 2017) (*en banc*). To demonstrate that the sentencing

court abused its discretion, "the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision." ***Commonwealth v. Morgan***, 258 A.3d 1147, 1157 (Pa. Super. 2021). "[W]here the trial court is informed by a pre-sentence report, it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." ***Id.*** "As long as the trial court's reasons demonstrate that it weighed the Sentencing Guidelines with the facts of the crime and the defendant's character in a meaningful fashion, the court's sentence should not be disturbed." ***Id.***

Additionally, this Court's review of the discretionary aspects of a sentence is confined by the statutory mandates of 42 Pa.C.S.A. § 9781(c) and (d). Section 9781(c) reads:

> **(c) Determination on appeal.**—The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:
>
> > (1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;
> >
> > (2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or
> >
> > (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.

- 21 -

> In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.

42 Pa.C.S. § 9781(c).  Subsection (d) provides:

> In reviewing the record, the appellate court shall have regard for:
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).  Finally, "[w]hen imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S.[A.] § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant." *Commonwealth v. Coulverson*, 34 A.3d 135, 144 (Pa. Super. 2011).

In the present case, the court stated:

> We sentenced the appellant within the standard range after careful review of the PSI, consideration of the appellant's allocution, the impact of his crimes on the victim and the arguments of counsel. (N.T. 12/14/2011 pgs. 10-12).  At the time of his sentencing the appellant's prior record score was five (5). The sentencing guidelines minimum for his burglary conviction was forty-eight (48) to sixty (60) months.  The standard range minimum sentencing guidelines for his conviction for aggravated assault is seventy-two (72) to ninety (90) months.  Counsel for the Commonwealth and the appellant agreed that the appellant's convictions for recklessly endangering another person and simple assault merged and consequently, we did not sentence him on those counts. (N.T. 12/14/2011 at p. 7, 11).  The Commonwealth sought consecutive sentences for the aggravated assault and

burglary convictions and we agreed that a lengthy sentence was appropriate. (***Id.*** pgs. 9-12). Accordingly, we sentenced the appellant within the standard range. On the burglary count we sentenced him to a minimum of forty-eight (48) months, which is at the bottom of the standard range. For his aggravated assault conviction, we sentenced him to serve a minimum of eighty-four (84) months, which is in the middle of the standard range. (***Id.***) We ordered the sentences to run consecutive because we determined that such a sentence was necessary to hold the appellant accountable, to allow sufficient time to reform and supervise him and to adequately protect the public.

Trial Court Opinion, 3/12/21, at 23-24.

Appellant's sentence was a reasonable exercise of the court's discretion. The court had the benefit of a presentence investigative report, so it presumably was aware of all appropriate sentencing factors and considerations. It carefully weighed the Sentencing Guidelines along with the facts of the case and Appellant's background reflected in his prior record score of 5. It sentenced Appellant within the standard range of the Guidelines for both offenses, and it did not commit any error in applying the Guidelines. There were no circumstances that rendered application of the Guidelines clearly unreasonable. The court considered all factors required under Section 9721(b), specifically, the protection of the public, the gravity of the offense in relation to its impact on the victim and the community, and Appellant's rehabilitative needs.

In his final argument, Appellant complains that his sentence constitutes cruel and unusual punishment under Article I, § 13 of the Pennsylvania

Constitution and the 8th Amendment of the United States Constitution.[2] In reviewing such a claim, this Court considers three factors: the offense gravity and harshness of penalty for gross disproportionality; sentences imposed on others in the same jurisdiction; and sentences imposed on others in other jurisdictions. *Commonwealth v. Spells*, 612 A.2d 458, 462 (Pa. Super. 1992) (*en banc*). The guarantee against cruel punishment in Article 1, Section 13 of the Pennsylvania Constitution provides no broader protections against cruel and unusual punishment than those extended under the Eighth Amendment. *Id.* at 461. However, this Court is not obligated to reach the second and third prongs of the *Spells* test unless a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *Commonwealth v. Rosario*, 248 A.3d 599, 615 (Pa. Super. 2021). In this case, Appellant fails to satisfy the first prong of the *Spells* test due to the gravity of his offenses. *Rosario*, 248 A.3d at 615 ("given the seriousness of Appellant's offenses, Appellant's sentence is not grossly disproportionate to the crime, and does not violate prohibitions against cruel and unusual punishment").

For these reasons, we affirm Appellant's judgment of sentence.

---

[2] Although Appellant did not raise this argument in the trial court, a claim of cruel and unusual punishment is a challenge to the legality of a sentence, **Commonwealth v. Brown**, 71 A.3d 1009, 1011, 1015-16 (Pa. Super. 2013), and therefore may be "raised for the first time in his [appellate] brief" on direct appeal. *Commonwealth v. Bromley*, 862 A.2d 598, 600 (Pa. Super. 2004).

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/07/2021</u>